# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs August 4, 2015

## STATE OF TENNESSEE v. ALISON BRIARS

**Appeal from the Criminal Court for Shelby County**
**No. 14-00181   Paula Skahan, Judge**

---

### No.  W2014-02308-CCA-R3-CD  -  Filed October 7, 2015

---

The Defendant, Alison Briars, pleaded guilty in the Shelby County Criminal Court to cruelty to animals, a Class A misdemeanor, with the length and manner of service of the sentence to be determined by the trial court.  *See* T.C.A. § 39-14-202 (2014).  The court sentenced the Defendant to eleven months and twenty-nine days, with sixty days' confinement and the remainder to be served on supervised probation.  On appeal, the Defendant contends that the trial court (1) erred in denying judicial diversion and (2) abused its discretion by not sentencing her to full probation.  We affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Blake D. Ballin, Memphis, Tennessee, for the appellant, Alison Briars.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Stark, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case relates to police officers investigating a deceased dog call and finding two pit bull terriers who had died of starvation.  The officers found and removed three live pit bull terriers from the home.  The Defendant pleaded guilty to one count of animal cruelty.

At the guilty plea hearing, the Defendant stipulated to the following facts stated by the prosecutor:

> On January 4th of 2013, [animal control] officers responded to . . . a dead dog call [at the Defendant's home] where they found a dead [pit bull terrier] puppy and a dead adult [pit bull terrier].
>
> [A]nimal control officers called police officers [who] observed the dogs' corpses and what appeared to be malnourishment of them and the bones that were sticking out of them and their emaciated look. [The officers] met with [the Defendant, who] indicated she owned the home and that those were her son's dogs. Her son was 14 years old at the time.

At the sentencing hearing, the Defendant testified that she had never had legal trouble, that she had a GED, and that she worked as a housekeeper at a hotel. She said that at the time of the dogs' deaths, her son, daughter, and her daughter's two children lived at her home. She said that her son received a pit bull terrier puppy from her brother when her son was five years old. She said that her son and his father were responsible for feeding the dog. She said that at first, her son's father helped her son care for the dogs, and when her son was older "[h]e would go in the backyard and feed the dogs and he would call his dad and tell his dad I ran out of dog food, can you get some dog food over here. And he would always either bring the dog food or he would send him money." The Defendant's family "ended up" with a female pit bull terrier who mated with their male dog and had puppies. The Defendant said, "I never said anything else about the dog. I was like y'all got to feed these dogs, take care of these dogs. That was the agreement" between the Defendant and her son's father.

The Defendant said that two or three days before the dogs died, she collapsed from dehydration and was taken to the emergency room. She said that at the time, she was attempting to obtain custody of her grandchildren because "we had some conflicts" with the Defendant's daughter. The Defendant agreed that the dogs would not starve to death over a short period and that she could see the dogs through a glass door in her home. She said that "I don't know exactly how much a dog's supposed to eat[, but they were] being fed every day. Sometimes two or three times a day."

The Defendant testified that on the day the police came to her home, her son's father came to the home and told the police that he was responsible for the dogs. In response to a police officer's observation that the dogs were underfed, her son's father asked "[How are] these dogs being underfed. Here's the dog food." She said he "showed everything to them." The Defendant unsuccessfully attempted to have her son's father appear in court to take responsibility for the dogs. The Defendant said that as the house was in her name, she took responsibility for what happened to the dogs. The Defendant

said that at the time the dogs died, she did not understand that although the dogs belonged to her son, they were ultimately her responsibility. The Defendant said that she no longer had animals in her home.

Photographs of the deceased dogs were received as an exhibit. The photographs showed that the dogs were emaciated to the point of appearing skeletal.

The Defendant testified that she was afraid of the dogs and would "peep out the door at the dogs[,]" but that she "never went in the backyard. I was sitting in the living room on the couch and I may have asked [my children] . . . where's the brown and white puppy or where's the tan puppy." She said that her middle daughter and her son fed the dogs. The Defendant said, "Two or three weeks before the dog[s] died . . . the dog[s] did not look" as they did in the photographs. She said, "[I] just couldn't understand how two dogs [were] starving and the other pups [were] not starving. They [were] in the same backyard." The Defendant said someone from the animal shelter, which took custody of the remaining three dogs, called and asked whether she was going to claim the dogs. The Defendant refused to claim them. She denied that the pit bull terriers were being starved to make them fight and said that she once refused to give a dog away to a man who participated in dog fighting.

When asked why she owed the juvenile court $6000, the Defendant testified that she attempted to obtain custody of her grandchildren. The Defendant said that her daughter "made a statement about [the Defendant's son] and [he] had to go down and give a statement and they arrested my son." The Defendant said that her son was held in juvenile detention for forty-two days and that she was charged $150 per night. She said that she had enough money to feed the dogs. She said that she watched the dogs being fed from inside the house and that she was sorry it happened.

The State argued that the Defendant was not being "candid" with the trial court. The prosecutor noted the Defendant's testimony that she watched the dogs from the living room and knew the individual puppies by color but that she was afraid of the dogs and was unaware of their condition. The State argued that the offense warranted the need for deterrence in the community and the need to send a message.

The Defendant argued that she handled a chaotic family situation to the best of her ability and that "the crime she committed was that she turned a blind eye to these dogs." The Defendant claimed that she was "amenable to rehabilitation," that she was employed, and that she now understood her responsibilities for animals living on her property. In spite of the "graphic and disturbing" photographs of the dogs, the Defendant maintained that a question remained relative to the dogs' physical conditions at the times of death.

The trial court found that the dogs were not fed and that the Defendant showed "a total lack of interest in providing for these two dogs[.]" The court noted that the

Defendant had a "pretty good" amenability to correction, that she had "okay" physical and mental health, that she had a GED and a "decent" job, and that she had no previous criminal record. Regarding the circumstances of the offense, the court found that the offense was "really horrendous" and that the charged crime "probably should have been . . . aggravated cruelty to animals." The court found that deterrence was needed to prevent future conduct by the Defendant. The court also found a need to deter the community from similar conduct due to widespread poor treatment of pit bull terriers and that "everybody that knows [the Defendant] should understand this conduct is not acceptable." The court denied judicial diversion on the basis it would not serve the public interest. The court sentenced the Defendant to eleven months and twenty-nine days, with sixty days in confinement and the remainder to be served on supervised probation. This appeal followed.

## I. Denial of Judicial Diversion

The Defendant contends that the trial court erred in denying judicial diversion. She argues that the court did not consider and weigh the appropriate factors and that in making its determination, the court relied solely on the circumstances of the offense without explaining its reasoning. The State responds that the court considered all of the appropriate factors and did not err in denying diversion. We agree with the State.

A trial court may order judicial diversion for certain qualified defendants who are found guilty of or plead guilty or nolo contendere to a Class C, D, or E felony or a lesser crime; have not previously been convicted of a felony or a Class A misdemeanor; and are not seeking deferral for a sexual offense. *See* T.C.A. § 40-35-313(a)(1)(B)(i) (Supp. 2013) (amended 2014). The grant or denial of judicial diversion is within the discretion of the trial court. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014) (citing T.C.A. § 40-35-313(a)(1)(A)). When considering whether to grant judicial diversion, a trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the ends of justice. *State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *see King*, 432 S.W.3d at 326 (stating that recent caselaw affecting the standard of review for sentencing determinations "did not abrogate the requirements set forth in *Parker* and *Electroplating*, which are essential considerations for judicial diversion"). "The record must reflect that the court has weighed all of the factors in reaching its determination." *Electroplating*, 990 S.W.2d at 229. If a trial court refuses to grant judicial diversion, "[T]he court should clearly articulate and place in the record the specific reasons for its determinations." *Parker*, 932 S.W.2d at 958-59. "The truthfulness of a defendant, or lack thereof, is a permissible

factor for a trial judge to consider in ruling on a petition for suspended sentence." *State v. Neeley*, 678 S.W.2d 48, 49 (Tenn. 1984)

On review of a decision to grant or deny judicial diversion, this court will apply a presumption of reasonableness if the record reflects that the trial court considered the *Parker* and *Electroplating* factors, specifically identified the relevant factors, and placed on the record the reasons for granting or denying judicial diversion, provided any substantial evidence exists to support the court's decision. *King*, 432 S.W.3d at 327. If, however, the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. *Id.* at 328.

The record reflects that the court considered all of the *Electroplating* factors. The Defendant argues that the court did not explain its reasoning in weighing the factors, made conclusory statements regarding deterrence, and injected its personal views into the decision. The State responds that under *King*, any defects in weighing one factor can be rectified if the court's reasoning is supported by substantial evidence.

The record reflects that the court placed significant weight on the "horrendous" circumstances of the offense and a need to deter the Defendant in denying diversion. The severity of the offense was demonstrated by the photographs, and the court noted the Defendant's callousness in her "total lack of interest" in the dogs, which went beyond the conduct required for animal cruelty. In regard to deterring others, the court said,

> I am shocked at the way people in this city treat animals, and especially the way they treat pit bulls. They're used for dog fighting, they're bred until they can no longer breed, and then they're turned out and left to fend for themselves in the streets. They're horribly abused. In this case, starved to death.

We note that the trial court discredited the testimony of the Defendant that she saw the dogs being fed every day:

> What just doesn't make any sense is that, supposedly . . . the dogs were eating and the dogs were not eating. . . I don't believe food was being provided to them. I don't know what the set-up was out there. Apparently, you don't either because you're too afraid to go into your own backyard. But it would have been obvious to anyone looking at these animals that they were just slowly starving to death . . . It doesn't make any sense. And the only conclusion I can come to is just total lack of interest in providing for these two dogs at all.

-5-

The court's discrediting the Defendant and finding that the Defendant was disinterested in the welfare of the dogs was relevant to the Defendant's amenability to correction, to the need for personal deterrence, and to the Defendant's attitude and her lack of remorse.

We conclude that the court identified and considered the relevant factors and placed on the record its reasons for denying judicial diversion. Substantial evidence exists to support the court's decision. We conclude that the court did not abuse its discretion in denying the Defendant's request for judicial diversion. The Defendant is not entitled to relief on this basis.

## II. Denial of Full Probation

The Defendant contends that the trial court abused its discretion by denying her request for full probation. She argues that because she did not intentionally cause the dogs' deaths, "the circumstances of [her conduct were] not so egregious as to justify the denial of full probation" and doing so contravened the purposes and principles of the sentencing act. The State responds that the circumstances of the offense were particularly "horrifying, shocking, and reprehensible" and that the court's reliance on the circumstances of the offense was consistent with the principle of avoiding depreciation of the seriousness of the offense. We agree with the State.

Although our supreme court has not considered whether the abuse of discretion with a presumption of reasonableness standard applies to misdemeanor sentencing determinations, it has stated that the standard "applies to all sentencing decisions," and this court has previously applied the standard to misdemeanor sentencing. *See State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014); *see also State v. Sue Ann Christopher*, No. E2012-01090-CCA-R3-CD, 2013 WL 1088341, at *6-8 (Tenn. Crim. App. Mar. 14, 2013), *perm. app. denied* (Tenn. June 18, 2013); *State v. Christopher Dewayne Henson*, No. M2013-01285-CCA-R3-CD, 2015 WL 3473468, at *5-6 (Tenn. Crim. App. June 2, 2015); T.C.A. § 40-35-401(d) (2014) (stating all sentencing questions pursuant to Code section 40-35-401(a) are subject to the same standard of review).

Although a trial court is not required to hold a misdemeanor sentencing hearing, a court must permit the parties to address, in relevant part, the manner of service. T.C.A. § 40-35-302(a) (2014). Trial courts are granted considerable discretion and flexibility in misdemeanor sentencing determinations. *State v. Troutman*, 979 S.W.2d 271, 273 (Tenn. 1998); *see State v. Combs*, 945 S.W.2d 770, 773-74 (Tenn. Crim. App. 1996). Although trial courts are required to state findings of fact relative to imposing sentences for felony convictions, courts are not required to do the same in imposing sentences for misdemeanor convictions. *Troutman*, 979 S.W.2d at 274. In determining the manner of service, a trial court must consider the purposes and principles of sentencing and the enhancement and mitigating factors and must not impose arbitrary incarceration. T.C.A.

§ 40-35-302(d); *see Troutman*, 979 S.W.2d at 274 (stating that "while the better practice is to make findings on the record when fixing a percentage of a . . . sentence to be served in incarceration, a . . . court need only consider the principles of sentencing and enhancement and mitigating factors . . . to comply with the legislative mandates of the misdemeanor sentencing statute").

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2014); *see Trotter*, 201 S.W.3d at 654.

We conclude that the trial court considered the appropriate purposes and principles of sentencing in ordering the Defendant to serve sixty days in confinement and the remainder of her sentence on probation. The record reflects that the court relied heavily upon the need to avoid depreciating the seriousness of the offense. *See* T.C.A. § 40-35-103(1)(B). The Defendant disregarded the welfare of two starving dogs on her property, and the court discounted her assertion that she was unaware of the dogs' deteriorating health. Given the Defendant's disregard for the dogs' welfare and her lack of remorse for her role in their deaths, the court's ordering partial confinement was reasonable. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE